# EXHIBIT 1

STATE OF MINNESOTA            DISTRICT COURT

COUNTY OF HENNEPIN        FOURTH JUDICIAL DISTRICT

| | |
|---|---|
| RedWind Renewables, LLC and<br>Dakota Plains Energy, Inc., | Case Type: |
|        Plaintiffs, | Court File No. _____ |
| v. | |
| Terna Energy USA Holding Corporation, | |
|        Defendant. | |

**SUMMONS**

THIS SUMMONS IS DIRECTED TO: Defendant Terna Energy USA Holding Corporation.

    **1.**    **YOU ARE BEING SUED**. Plaintiffs RedWind Renewables, LLC and Dakota Plains Energy, Inc. have started a lawsuit against you. Plaintiffs' Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

    **2.**    **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

          V. John Ella
          Trepanier MacGillis Battina P.A.
          8000 Flour Exchange Building
          310 Fourth Avenue South
          Minneapolis, MN 55415
          Phone: 612.455.0500
          Fax: 612.455.0501

    **3.**    **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiffs' Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiffs should not be given everything asked for in the Complaint, you must say so in your Answer.

**4.      YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**  If you do not answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiffs everything asked for in the complaint.  If you do not want to contest the claims stated in the Complaint, you do not need to respond.  A default judgment can then be entered against you for the relief requested in the Complaint.

**5.      LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

**6.      ALTERNATIVE DISPUTE RESOLUTION.**  The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated:  April 30, 2021.                    **TREPANIER MACGILLIS BATTINA P.A.**

*/s/ V. John Ella*

By:  _____
        V. John Ella, Atty. Reg. No. 249282
        *jella@trepanierlaw.com*
        8000 Flour Exchange Building
        310 Fourth Avenue South
        Minneapolis, MN  55415
        Phone:  612.455.0500
        Fax:  612.455.0501
        *www.trepanierlaw.com*

        **ATTORNEYS FOR PLAINTIFFS**

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that, pursuant to Minn. Stat. § 549.211, sanctions, including reasonable attorney's fees and other expenses, may be awarded to the party or parties against whom the allegations in this pleading are asserted, if the Court should find that: (1) the pleading is being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions are not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions do not have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or

Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

discovery; or (4) the denials of factual contentions are not warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Dated:  April 30, 2021.

*/s/ V. John Ella*

By: _____

V. John Ella



STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                          FOURTH JUDICIAL DISTRICT
                                                          Case Type:

---

RedWind Renewables, LLC and                 Court File No. _____
Dakota Plains Energy, Inc.,

      Plaintiffs,                              **COMPLAINT**

v.

Terna Energy USA Holding Corporation,

      Defendant.

---

     Plaintiffs RedWind Renewables, LLC ("RW") and Dakota Plains Energy, Inc. ("DP"),

through their undersigned counsel, state as follows for their Complaint against Defendant Terna

Energy USA Holding Corporation ("Terna"):

## PARTIES

    1.    RW is a Minnesota limited liability company whose principal place of business is

located in Eden Prairie, Hennepin County, Minnesota. Dan Rustowicz, who is a resident of and

domiciled in Minnesota, is the sole member of RW.

    2.    DP is a South Dakota corporation whose principal place of business is located in

Aberdeen, South Dakota. Robin Johnson and Heath Johnson, both of whom are residents of and

domiciled in South Dakota, are the sole members of DP.

    3.    Terna is a Delaware corporation whose principal place of business is located in

San Francisco, California.

## JURISDICTION AND VENUE

4.      As set forth in more detail throughout this Complaint, this Court has jurisdiction over the subject matter of this action and may exercise personal jurisdiction pursuant to Minnesota Statute § 543.19 because Terna: (1) entered into a contract with RW and DP whereby Terna agreed "to submit to the exclusive jurisdiction of the courts of the State of Minnesota"; (2) committed acts causing injury in Minnesota; and (3) Minnesota has a substantial interest in providing a forum, and any burden placed on Terna would not violate fairness and substantial justice.

5.      Venue is proper in this County pursuant to the jurisdiction and venue provision of the Development Agreement Terna entered into with RW and DP and, pursuant to Minnesota Statute §§ 542.01 and 542.09 because the cause of action (or some part therefore) arose in this County.

## FACTUAL BACKGROUND

6.      At times material hereto, Terna was, and is, in the business of seeking investment opportunities in wind and solar energy projects in the United States, including greenfield development of wind farms in suitable sites in South Dakota.

7.      Terna's parent company, Terna Energy, holds itself out as the largest investor in the renewable energy sources ("RES") sector in Greece and the biggest Greek company in the sector worldwide with a presence in the United States and Southeastern Europe and as a company who has invested "billions" in RES projects.

8.      At times material hereto, RW and DP were, and are, in the business of providing project development services in the field of renewable energy, including utility scale wind and solar energy projects.

2

9.      At some point prior to September 1, 2019, Terna decided to pursue one or more wind farm projects in South Dakota.

10.     Terna had performed no other wind farm development work in South Dakota, had no offices in South Dakota, and did not have the infrastructure in place in South Dakota to successfully develop such a project.

11.     Accordingly, in September of 2018, Terna began having discussions with RW and DP about engaging them to provide services necessary to advance a potential wind farm project Terna wished to develop in South Dakota that was originated by RW and DP, namely the Sully County Wind Project.

12.     RW, DP and Terna signed a Wind Farm Project Development Agreement dated September 1, 2019 ("the Development Agreement").  A true and correct copy of the Development Agreement is attached hereto as Exhibit A and incorporated herein by this reference.

13.     The development of a wind farm is a complex process that requires multiple steps, including the critical and necessary step of engaging with, educating, and negotiating with landowners to lease their lands.  Because of RW and DP's experience and expertise in renewable energy development, and because of their contacts in South Dakota, and DP's presence and proximity to the agreed upon targeted project sites, Terna entered into the Development Agreement to obtain RW and DP'S assistance in developing the projects in South Dakota.

14.     One of the most critical steps in the development of any project involving a wind farm is obtaining the right to lease rural property upon which to construct the wind turbine generators and infrastructure necessary to generate electricity.  The reason is evident: without the land, there is no place to erect the wind turbine generators and infrastructure.

15.     Prior to the execution of the Development Agreement, Terna had identified certain areas on South Dakota where it wanted to potentially locate its wind farms by physically flying to South Dakota and visiting several potential and respective sites. Terna ultimately had the preliminary, and final say on every single aspect of the siting and development process.

16.     Obtaining leases for property to erect wind turbine generators and infrastructure upon requires significant effort and is often very difficult.  This is particularly true where, as here, the developer (Terna) is a large, foreign company.  Thus, having companies such as RW and DP, locally respected and connected politically, involved is even that much more important given their local connections.

17.     Following execution of the Development Agreement, RW and DP immediately began taking steps obtain leasing rights to the requisite number of areas necessary for Terna's wind farms.  These activities included, but were not limited to, having informational meetings and events for landowners, extensive mailer campaigns, numerous phone calls, holding office hours, attending funerals and wakes, meeting personally with landowners, negotiating leases with landowners, obtaining payment information (e.g., bank account numbers for direct deposit of lease payments), and working with local government officials.  Additionally, RW and DP provided local knowledge and intelligence for Terna employees and representatives who had no connection to the area, introduced Terna employees and representatives to landowners and government officials, and offered countless suggestions and revisions to the form lease agreements provided by Terna because they knew South Dakota landowners would not agree to some of Terna's standard terms.

18.     RW and DP's efforts successfully resulted in numerous landowners agreeing to lease thousands of acres to Terna for the development of two wind farm projects: one commonly

4

referred to as the Andover Wind Energy Project and one commonly referred to as the Sully Wind Energy Project.

19.      Section 3.4 of the Development Agreement provides for a Land Acquisition Success Fee to be paid to RW and DP if a minimum number of acres is acquired for the Andover and Sully Projects.

20.      Through their efforts, RW and DP were able to secure approximately 12,088.78 acres of leased land for the Andover Project.  Similarly, they were able to secure approximately 11,356 acres of leased land for the Sully Project.  RW and DP were able to secure these thousands of acres and signed leases from the landowners despite limitations on being able to meet personally with numerous landowners because of the global COVID-19 pandemic, which struck right at the outset of the land commencement campaign, March 15, 2020.

21.      On or about December 21, 2020, after RW and DP had secured the thousands of acres necessary for Terna to proceed with development of the wind farm projects, Terna sent a letter to RW and DP in which it alleged RW and DP were in default under the Development Agreement.

22.      RW and DP provided a detailed response to Terna's December 21, 2020 letter in which it explained why it was not in default under the Development Agreement.

23.      On February 5, 2021, Terna sent a letter to RW and DP claiming RW and DP were in default and terminating the Development Agreement, allegedly pursuant to Section 7.2 of the Agreement.

24.      On February 23, 2021, after terminating the Development Agreement, Terna acknowledged that RW and DP had successfully acquired 12,088.78 acres for the Andover

Project and, subsequently, paid RW and DP the Land Acquisition Success Fee required by the Development Agreement for the same.

25.     Terna has refused to pay RW and DP the Land Acquisition Success Fee for the Sully Project, however, claiming they are not entitled to the same because the owner of the final approximately 2,640 acres required to trigger the Land Acquisition Success Fee did not officially commit until after Terna wrongfully terminated the Development Agreement, despite the fact that it was the relationship between DP and the final landowner, and the work that DP put into obtaining the commitment, that led to the landowner to agree to the lease.

26.     There was no good faith basis for Terna to terminate the Development Agreement, and its decision to do so constitutes a breach of contract.

27.     Terna's true motive for terminating the Development Agreement was not because RW and DP were in default or failed to substantially perform their obligations under the Agreement but, instead, was to avoid paying RW and DP money to which they were, and would become, entitled to in the magnitude of millions of dollars.

28.     Section 3.2 of the Development Agreement Provided a Success Fee that was separate and apart from the Land Acquisition Success Fee.  Specifically, Paragraph 3.2 provides, in pertinent part:

(a)     In the event that Terna Energy decides to proceed with the construction and operation of a Project and actively seeks construction financing for a Project, Terna Energy shall pay to the Service Providers for each Project that achieves Financial Closing during the Term of this Agreement or within eighteen (18) months from its termination (for reasons other than for Service Providers Default under Section 7.2 or for Change of Control under section 7.3) a success fee equal to the product of (a) $20,000 per MW, multiplied by (b) the Project Capacity (the "Success Fee"). The Service Providers shall each be entitled to 50% of the Success Fee.

6

29.     Upon information and belief, Terna intends to proceed with the construction and operation of the Andover and Sully Projects.

30.     By allegedly terminating the Development Agreement pursuant to Section 7.2, Terna is attempting to deprive RW and DP of payment of the Section 3.2 Success Fee.

31.     The Success fee for Andover Wind Energy Project is estimated to be $3,990,000 million.

32.     The Success fee for Sully Wind Energy Project is estimated to be $4,104,000 million.

## COUNT I – BREACH OF CONTRACT

33.     RW and DP repeat and re-allege the allegations in Paragraphs 1-32 above as if set forth fully herein.

34.     The Development Agreement was a valid, binding and enforceable contract.

35.     RW and DP performed their obligations under the Development Agreement, despite an unprecedented global pandemic, and Terna being excruciatingly slow on all decision making affecting the projects and cumbersome to deal with at every turn.

36.     Terna breached the Development Agreement by, among other things, unlawfully terminating it and refusing to pay RW and DP amounts owed and that would become owed.

37.     RW and DP have been, and continue to be, damaged by Terna's breach of the Development Agreement and are entitled to recover damages from Terna to compensate them in an amount to be proven at trial and in excess of $50,000.

## COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

38.     RW and DP repeat and re-allege the allegations in Paragraphs 1-37 above as if set forth fully herein.

39.     The Development Agreement includes an implied duty of good faith and fair dealing.

40.     Terna breached the duty of good faith and fair dealing by, among other things, terminating the Development Agreement under false pretenses and for the purpose of depriving RW and DP amounts owed and amounts that would become due in the future resulting from the success of the projects.

41.     RW and DP have been, and continue to be, damaged by Terna's breach of the Development Agreement and are entitled to recover damages from Terna to compensate them in an amount to be proven at trial and in excess of $50,000.

## COUNT III – DECLARATORY JUDGMENT

42.     RW and DP repeat and re-allege the allegations in Paragraphs 1-41 above as if set forth fully herein.

43.     RW and DP anticipate Terna will argue that RW and DP are not entitled to the Success Fee because Terna has not yet achieved "Financial Closing" on the Andover and Sully Projects as such term is used in Section 3.2 of the Development Agreement.

44.     Had Terna not unlawfully terminated the Development Agreement it would have remained in effect until at least September 1, 2022 pursuant to Section 5.1 of the Agreement.

45.     Section 3.2 provided RW and DP were entitled to a Success Fee if a project achieved Financial Closing during the term of the Development Agreement "or within 18 months

after its termination (for reasons other than for Service Providers Default under Section 7.2 or for Change of Control under Section 7.3)."

46.    The Court should declare that Terna's termination of the Development Agreement was unlawful, that RW and DP were not in default, that the Development Agreement was not properly terminated for cause and, therefore, that the time period set forth for Financial Closing to occur is up to and including 18 months after September 1, 2022.

47.    RW and DP also believe Terna will assert that certain restrictions in Section 6.4 of the Development Agreement preclude RW and Terna from working and providing services to other wind energy developers.

48.    The Court should declare that Terna's termination of the Development Agreement was unlawful, that RW and DP were not in default, that the Development Agreement was not properly terminated for cause and, therefore, that the restrictions and restrictive covenants on RW and DP contained in Section 6.4 are unenforceable.

49.    The declaratory relief sought by Plaintiffs in this action is authorized by, under, and pursuant to Rule 57 of the Minnesota Rules of Civil Procedure and Chapter 555 of Minnesota Statutes, the Minnesota Uniform Declaratory Judgments Act.

50.    This matter involves a genuine and justiciable controversy arising out of the conflicting claims of the parties with regard to the respective rights of Plaintiffs and Defendant under the Agreement.

51.    A declaratory judgment determining the respective rights of the parties would serve the useful and important purpose of clarifying the legal relationship between Plaintiffs and Defendant and would settle the controversy between them.

52.     The court should make such other declarations as are appropriate and authorized under the Minnesota Uniform Declaratory Judgments Act.

53.     The court should award Plaintiffs their reasonable costs pursuant to Minn. Stat. § 555.10.

**PRAYER FOR RELIEF**

WHEREFORE, RedWind Renewables, LLC and Dakota Plains Energy, Inc. respectfully request that the Court enter judgment in their favor and against Terna Energy USA Holding Corporation and award RedWind Renewables, LLC and Dakota Plains Energy, Inc. the following relief:

1.     Judgment awarding damages in RedWind Renewables, LLC and Dakota Plains Energy, Inc.'s favor in an amount to be proven at trial, but in excess of $50,000, together with an award of interest and costs including legal fees;

2.     A declaratory judgment holding Terna's termination of the Development Agreement was unlawful, that RedWind and Dakota Plains were not in default, that the Development Agreement was not properly terminated for cause and, therefore: (1) the time period for set forth in Section 3.2 of the Development for RedWind Renewables, LLC and Dakota Plains Energy, Inc. to be entitled to Success Payments is up to and including 18 months after September 1, 2022; and (2) the restrictions and restrictive covenants on RedWind and Dakota Plains contained in Section 6.4 are unenforceable;

3.     Awarding RedWind Renewables, LLC and Dakota Plains Energy, Inc. their costs and disbursements as authorized by law; and

4.     Awarding RedWind Renewables, LLC and Dakota Plains Energy, Inc. all other relief the Court deems just and equitable.

Dated:  April 30, 2021.                          **TREPANIER MACGILLIS BATTINA P.A.**

                                                 */s/ V. John Ella*
                                      By: _____
                                            V. John Ella, Atty. Reg. No. 249282
                                            *jella@trepanierlaw.com*
                                            8000 Flour Exchange Building
                                            310 Fourth Avenue South
                                            Minneapolis, MN  55415
                                            Phone:  612.455.0500
                                            Fax:  612.455.0501
                                            *www.trepanierlaw.com*

                                      **LANE & WATERMAN, LLP**

                                            Jason J. O'Rourke
                                            220 North Main Street, Suite 600
                                            Davenport, IA 52807
                                            Telephone: (563) 324-3246
                                            Facsimile: (563) 324-1616
                                            Email: jorourke@l-wlaw.com

                                      *Pro Hac Vice Motion to be submitted*

                                      **ATTORNEYS FOR PLAINTIFFS**


                                      **<u>ACKNOWLEDGEMENT</u>**

The undersigned hereby acknowledges that, pursuant to Minn. Stat. § 549.211, sanctions, including reasonable attorney's fees and other expenses, may be awarded to the party or parties against whom the allegations in this pleading are asserted, if the Court should find that: (1) the pleading is being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions are not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions do not have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; or (4) the denials of factual contentions are not warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.


                                                 */s/ V. John Ella*
Dated:  April 30, 2021.               By: _____
                                            V. John Ella

Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

## WIND FARM PROJECT DEVELOPMENT AGREEMENT

THIS WIND FARM PROJECT DEVELOPMENT AGREEMENT (this "Agreement") is made and entered into as of the 1st of September, 2019 ("Effective Date") by and among Terna Energy USA Holding Corporation, a Delaware corporation ("Terna Energy"), RedWind Renewables, LLC, a Minnesota limited liability company ("RW"), and Dakota Plains Energy, Inc., a South Dakota corporation ("DPE") (RW and DPE individually a "Service Provider" and collectively the "Service Providers").  Terna Energy, and Service Providers are sometimes referred to in this Agreement individually as a "Party" and collectively as the "Parties."

### R E C I T A L S

WHEREAS, Service Providers are in the business of providing project development services in the field of renewable energy, specifically, but not limited to, utility scale wind and solar energy projects;

WHEREAS, Terna Energy is seeking investment opportunities in wind and solar energy projects in the US, including greenfield development of wind farms in suitable sites in South Dakota;

WHEREAS, Terna Energy wishes to retain Service Providers to provide certain development services in connection with potential wind farms as set forth herein; and

WHEREAS, Service Providers desire to serve as independent contractors to provide such project development services as set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual undertakings contained herein, the Parties hereto agree as follows:

### ARTICLE 1.

### Definitions

**1.1      Defined Terms.  The following terms shall have the following meanings when used in this Agreement:**

"Affiliate" of a specified individual or Entity means any other person or entity which directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the individual or Entity specified.  As used in this definition, each of the terms "control," "controlled by" and "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an individual or Entity, whether through ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Applicable Law" means, with respect to each Party, all mandatory provisions of laws, codes, ordinances, statutes, rules, regulations, orders, decrees, judgments, injunctions, notices or binding agreements promulgated or entered into by any Governmental Authority having

1



EXHIBIT
A

jurisdiction over such Party with respect to the Phase I Projects or such Party's obligations under this Agreement, as the same may be modified, amended or repealed from time to time.

"Applicable Project Company" means a special purpose entity to be established by Terna Energy, whose sole activity shall be the development, construction, ownership and operation of a Project.

"Base Annual Fee" has the meaning set forth in Section 3.1.

"Business Day" means any day other than a Saturday, Sunday or a day which is a bank holiday in the State of South Dakota.

"Change of Control" means the sale of all or substantially all the assets of a Party; any merger, consolidation or acquisition of a Party with, by or into another company, entity or person; or any change in the ownership of more than fifty percent (50%) of the voting capital stock of a Party in one or more related transactions.

"Claiming Party" has the meaning set forth in Section 10.1.

"Claims" means claims, actions, damages, expenses (including, without limitation, reasonable attorneys' fees), fines, penalties, losses or liabilities.

"Commercial Operation Date" ("COD") means, with respect to a Project, the date on which construction and trial operation of such Project is completed and such Project completes the interconnection process and is approved for participation in applicable Independent System Operator's market operations.

"Confidential Information" means any information concerning the Phase I Projects or Terna Energy or its Affiliates that is not publicly known, including without limitation all such information known to Service Providers as of the Effective Date and all information that is obtained or generated by Service Providers through the provision of the Project Development Services or otherwise obtained by Service Providers from and after the Effective Date. For the avoidance of doubt, Confidential Information includes all wind data pertaining to the Phase I Projects, whether gathered prior to or after the Effective Date. Information will no longer be deemed "Confidential Information" if it (i) becomes publicly known through no unauthorized act of Service Providers, (ii) is rightfully received from a third party who is not, to the knowledge of Service Providers, under a duty of confidentiality, or (iii) is independently developed by the Service Providers without use of the Confidential Information or otherwise in violation of this Agreement.

"CPI" means the United States Department of Labor Consumer Price Index.

"Dispute" means any dispute, controversy or claim arising out of or relating to this Agreement, including any allegation of breach, invalidity, unenforceability, termination or enforcement of this Agreement.

"Documents" has the meaning set forth in Section 6.6.

2

"DPE" has the meaning set forth in the Preamble.

"Effective Date" has the meaning set forth in the Preamble.

"Energy Offtake Agreement" has the meaning set forth in Section 2.1(g).

"Entity" means an individual, partnership, corporation, limited liability company, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Extension Term" has the meaning set forth in Section 5.1.

"FERC" means the Federal Energy Regulatory Commission or its successor agency.

"Financial Closing" means, with respect to a Project, the date on which the later of the following occurs: (i) the first disbursement or borrowing under any construction debt financing for such Project, and (ii) the initial funding by third-party tax equity for such Project.

"Financing Arrangements" means arrangements for debt and/or tax equity financing for the construction of a complete Project in an amount sufficient for Terna Energy to fund construction thereof, on terms satisfactory to Terna Energy.

"First GIA Project(s) Capacity" has the meaning set forth in Section 3.1.

"Fixed Fee" has the meaning set forth in Section 3.1.

"Force Majeure" has the meaning set forth in Section 10.1.

"

"Generation Interconnection Agreement (GIA)" means the form of interconnection agreement applicable to and following an interconnection request for a Project to an ISO.

"Governmental Approvals" means any authorization, approval, consent, license, registration, lease, ruling, permit, tariff, certification, exemption, filing or registration by or with any Governmental Authority.

"Governmental Authority" means the United States and any federal, national, regional, state, county, municipality, or township, or any political subdivision, agency, court or instrumentality of any of the foregoing and any independent system operator, including SPP and/or MISO, any electric reliability organization or other regulatory bureau, authority, body or entity having legal jurisdiction over the matter or person in question.

"Indemnified Party" means a Service Providers Indemnified Party or a Terna Energy Indemnified Party.

"Initial Term" has the meaning set forth in Section 5.1.

"ISO" means Independent System Operator.

3

"Land Acquisition Success Fee" has the meaning set forth in Section 3.4.

"Lump Sum" has the meaning set forth in Section 3.1.

"MISO" means Midcontinent Independent System Operator.

"Net Sale Price" means the Purchase Price minus the Project Development Costs.

"Other Real Estate Agreements" has the meaning set forth in Section 2.1 (c).

"Party" or "Parties" has the meaning set forth in the Preamble.

"Phase I Projects" means the following four (4) potential wind projects that will be subject to further assessment under the terms of this Agreement as to their suitability for development and/or construction:

| | Project | Estimated Project Sizing |
|---|---|---|
| 1. | Sully Wind (located in Sully County, SD) | 350MW |
| 2. | Faulk Wind (located in Faulk County, SD) | 200 MW |
| 3. | Day Wind (located in Day County, SD) | 200 MW |
| 4. | Dakota Zephyr Wind (located in Day and Brown Counties, SD) | 200 MW |
| | TOTAL | 950MW |

The estimated project sizing set forth in the table above is not definitive but solely reflects the initial draft design of Terna Energy. Each Project's final sizing shall be determined by Terna Energy at its absolute discretion. Each Project's final sizing shall be communicated in writing by Terna Energy to the Service Providers.

"Project" means each of the Phase I Projects.

"Project Capacity" means the actually installed nameplate capacity, expressed in MW of all wind turbine generators for a Project that are interconnected to the applicable ISO under the GIA.

4

"Project Configuration" means the sizing, design and preparation of a Project configuration which includes, but is not limited to, wind turbines siting, access and internal road network, underground medium voltage lines route, project substation's location, High Voltage overhead tie line route to the point of interconnection to the grid, Operations and Maintenance building, temporary laydown area, batch plant and any other facilities required by the Project during its construction and operation.

"Project Development Costs" means an amount equal to the documented costs and expenses paid or incurred by Terna Energy, the Applicable Project Company or any of their Affiliates (including, for the avoidance of doubt, the direct costs for work and services performed by Terna Energy and its Affiliates internal personnel) that are incurred in connection with the development or construction of a Project (including any Fixed Fee paid or payable to the Service Providers under Section 3.1) after the Effective Date and up to (a) the execution of the PSA for a Project, for the purposes of the definition of the Net Sale Price or (b) the acquisition of the Project by the Service Providers for the purposes of Article 4 (Project Transfer to the Service Providers) and as adjusted for the CPI.

"Project Development Services" has the meaning set forth in Section 2.1.

"Project Development Team" has the meaning set forth in Section 6.2(a).

"Project Disposition Fee" has the meaning set forth in Section 3.3(a).

"Proposed Phase I Projects' Area" has the meaning set forth in Section 3.4(a).

"Prudent Wind Development Practices" means those practices, methods and acts conducted at a minimum in accordance with standards applicable to the North American wind energy development industry, which a prudent owner, and/or developer would follow in connection with the development of a wind energy facility with a similar operating profile, facilities and equipment to accomplish the objectives of securing financing, constructing and operating a wind energy facility at a reasonable cost and consistent with Applicable Law, reliability, safety and expedition.

"PSA" has the meaning set forth in Section 3.3(a).

"Purchase Price" has the meaning set forth in Section 3.3(b).

"RW" has the meaning set forth in the Preamble.

"SDPUC" means the South Dakota Public Utilities Commission.

"Service Providers" has the meaning set forth in the Preamble.

"SPP" means the Southwest Power Pool, Inc.

"Success Fee" has the meaning set forth in Section 3.2.

5

"Tariff" means the Transmission Provider's tariff through which open access transmission service and interconnection service are offered, as filed with FERC, and as amended or supplemented from time to time, or any successor tariff.

"Term" means the period of time during which this Agreement shall remain in full force and effect which is further defined in Section 5.1.

"Terna Energy" has the meaning set forth in the Preamble.

"Terna Energy Default" has the meaning set forth in Section 7.1.

"Terna Energy Indemnified Party" means Terna Energy and its members and Affiliates, and all of their respective owners, officers, directors, employees and representatives.

"Service Provider Default" has the meaning set forth in Section 7.2.

"Service Providers Indemnified Party" shall mean each Service Provider and their respective Affiliates, and all of their respective owners, officers, directors, employees and representatives.

"Transmission Provider" means the public utility that owns, controls, or operates transmission or distribution facilities used for the transmission of electricity in interstate commerce and provides transmission service under the Tariff.

"Wind Leases" has the meaning set forth in Section 2.1 (a).

**1.2** **Other Definitions. Unless otherwise indicated:**

    (a)    All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

    (b)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.

    (c)    References to other agreements defined herein shall include such agreements as they may be amended, supplemented or otherwise modified from time to time.

    (d)    Terms defined in this Agreement by reference to any other agreement, document or instrument shall have the meanings assigned to them in such agreement, document or instrument whether or not such agreement, document or instrument is then in effect.

    (e)    The words "include" and "including" and words of similar import when used in this Agreement shall not be limiting but shall rather be deemed to be followed by the words "without limitation."

    (f)    The singular includes the plural, and the plural includes the singular.

6

(g)     Words importing any gender include the other gender.

(h)     References to statutes or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending or replacing the statute or regulation referred to.

## ARTICLE 2.

### Engagement of RW and DPE

**2.1     Engagement of Service Providers; Project Development Services; Terna Energy Responsibilities.**

Subject to Section 6.5(b), Terna Energy hereby engages Service Providers to jointly and severally provide, and Service Providers jointly and severally accept such engagement and agree to provide to Terna Energy the project development services described in this Section 2.1 ("Project Development Services"), in accordance with the time schedule, milestones, and task allocations set forth in Exhibit A, attached hereto and made part hereof by reference.

(a)     Wind Leases. Following written notice from Terna Energy, Service Providers shall initiate negotiations with landowners whose land is within the boundary of a Project's proposed site at commercial terms that will be determined by Terna Energy and shall obtain and deliver to Terna Energy and/or the Applicable Project Company for execution all, lease or option to lease agreements required to establish full Project site control (collectively, the "Wind Leases"). The land included in the Wind Leases shall be located within the Proposed Phase 1 Projects' Area(s) set forth in Exhibit B, attached hereto and made part hereof by reference. The Service Providers will use commercially reasonable efforts, reasonably documented, to secure contiguous acreage by beginning at the approximate center (or as otherwise agreed) of each Project Area and shall keep Terna Energy reasonably informed as to the status of their efforts and the process, and Terna Energy will instruct and guide the Service Providers according to each Project's requirements, which requirements pertain to the adequacy and suitability of the acreage in order for the Project(s) to be technically satisfactory, permitted, achieve financial performance, be financed, built and operated. Upon the request of the Service Providers, Terna Energy will consult with the former in determining the best course of action where contiguous acreage is not available or not reasonably attainable, it being understood that failure to procure a contiguous acreage may result in abandoning the Project in question. Each Wind Lease shall either be based on a template agreement provided by Terna Energy or be in form and substance acceptable to Terna Energy and shall include commercial terms that will have been approved by Terna Energy in writing prior to execution by the landowners. Terna Energy may request Service Providers to obtain an amendment to a Wind Lease as Terna Energy may reasonably determine is necessary, inter alia, for the development, financing (including construction financing and tax equity funding), construction, operation, or maintenance of a Project. Service Providers acknowledge and agree that they will use commercially reasonable efforts to obtain such amendments as part of the Project Development Services.

(b)     Registration with ISO; GIA. Service Providers shall support and actively assist Terna Energy with (a) the Resource/Generating Facility Registration in respect of a Project

7

with the applicable Independent System Operator ("ISO") (e.g. SPP/MISO) including the attendance of meetings with representatives of the applicable ISO at Terna Energy's request and in compliance with its instructions, (b) the preparation of all necessary documentation and securing a GIA based on technical and other information provided by Terna Energy. All applications and supporting documentation submitted to the applicable ISO as well as the GIA shall in any case be subject to Terna Energy's final approval in all respects.

(c)    Project Configuration. Terna Energy shall be solely responsible for the Project Configuration. Service Providers shall provide assistance to the extent requested by Terna Energy and in full consultation and cooperation with Terna Energy, landowners and any other third parties acceptable to or desirable by Terna Energy, but Terna Energy shall have final decision-making authority and ultimate responsibility with respect to Project Configuration.

(d)    Public Relations. Service Providers in coordination with Terna Energy shall lead the effort to establish and maintain good relations with local officials, businesses, individuals and media in accordance with Prudent Wind Development Practices, but in any case, subject to Terna Energy's approval, such approval not to be unreasonably withheld. In no case shall Service Providers issue press releases or make other official public written or oral statements pertaining to a Project or Terna Energy without Terna Energy's prior written consent thereto, both as to timing and substance. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that Service Providers are permitted to meet and discuss the potential development of a Project with landowners whose land is or may be part of a Project's proposed site or representatives of a Governmental Authority or the SDPUC regarding a Governmental Approval or a SDPUC permit for a Project without the prior approval of Terna Energy, provided (i) Service Providers keep Terna Energy materially informed as to any developments, and (ii) Service Providers limit such discussions to those matters reasonably required to perform the Project Development Services in accordance with this Agreement and in any case complies with Terna Energy's instructions, if any, regarding the scope and substance of such discussions as they pertain to a Project, Terna Energy, the Applicable Project Company, or any of their Affiliates. At the request of Terna Energy and as part of the outreach efforts to the local community, DPE shall receive, respond within a reasonable timeframe, and handle and record all inquiries, comments and responses about a Project from landowners, regulatory agencies, local government units and the general public on behalf and in consultation with Terna Energy and/or the applicable Project Company.

(e)    Other Real Estate Agreements. Following execution of Wind Leases for a Project and as may be required, Service Providers shall initiate negotiations with easement holders and other parties that may have preexisting interests on the lands within the boundary of a Project's proposed site that is subject to the Wind Leases and shall obtain and deliver to Terna Energy and/or the Applicable Project Company for execution all easement, license, crossing, accommodation, non-disturbance and subordination agreements required to establish full Project site control (collectively, the "Other Real Estate Agreements") and taking such other actions as may be required to achieve the Financial Closing, at Terna Energy's sole cost and expense. Each Other Real Estate Agreement shall either be based on a template agreement provided by Terna Energy or be in form and substance acceptable to Terna Energy. Terna Energy may request Service Providers to obtain an amendment to any Other Real Estate Agreement as Terna Energy may reasonably determine is necessary for the development, financing (including construction financing and tax equity funding), construction, operation, maintenance of a Project. Service Providers acknowledge

8

and agree that they will use commercially reasonable efforts to obtain such amendments as part of the Project Development Services.

(f)     Governmental Approvals. Service Providers shall (i) perform an initial review and assessment of applicable local or State zoning approvals and permit requirements as well as local and State rules or ordinances regarding decommissioning, safety buffer zones, setback requirements, noise restrictions, shade, flicker, shadow or visibility restrictions, or other zoning rules or regulations, affecting the ownership, construction, operation or maintenance of a Project. Such initial review shall include the procedure for applying for and obtaining all required Governmental Approvals or conditional use permits at state, county and local level; (ii) assist Terna Energy in applying for and securing on behalf of Terna Energy and/or the Applicable Project Company all required Governmental Approvals or conditional use permits at federal, state, county and local level, necessary for the development, construction, and operation and maintenance of a Project based on the Project Configuration, including obtaining all environmental, pre-construction and post-construction permits or authorizations and taking such other actions otherwise required to secure such permits and authorizations, including filing any permit applications or submissions to meet the requirements to obtain any necessary Governmental Approvals or conditional use permits, or otherwise attending or participating (including physically) in any public hearings or proceedings with respect to obtaining the Governmental Approvals or conditional use permits on behalf of Terna Energy and/or the Applicable Project Company; and (iii) assist Terna Energy in applying for and securing on behalf of Terna Energy and/or the Applicable Project Company the required SDPUC permit for wind energy facility and transmission facility (if applicable) for a Project based on the Project Configuration. In particular, Service Providers shall provide all reasonably requested support throughout the SDPUC permitting procedure, including submission of applications in electronic or paper form, notification in writing of area landowners, filings with county auditors, participation in meetings of local review committees and provision of requested information on a Project, as approved by Terna Energy, and at the request and direction of Terna, attendance in person and participation on behalf of Terna Energy and/or the Applicable Project Company and in support of the submitted application for the SDPUC permit in the public input meeting and all public hearings held by SDPUC, monitoring and informing Terna Energy of the progress of the SDPUC proceedings and in general taking such other actions otherwise required or necessary to secure such SDPUC permit.

(g)     Energy Offtake Agreements. Service Providers shall support and actively assist Terna Energy in the investigation for and evaluation of possible energy offtake arrangements and the negotiation of energy offtake agreements, whether in the form of power purchase agreements or in the form of energy hedges or a contract for differences ("Energy Offtake Agreements") with creditworthy counterparties. The selection of the offtaker and the form and content of an Energy Offtake Agreement shall by subject to Terna Energy's final approval in all respects.

(h)     Financing Arrangements. At the request of Terna Energy, Service Providers shall support and actively assist Terna Energy in the investigation for and evaluation of possible Financing Arrangements with potential financing parties. The selection of the financing parties, the structure of the Financing Arrangements and the form and content of the definitive documentation of Financial Arrangements shall rest solely with Terna Energy.

9

(i)     Notices.   Upon either Service Provider having actual knowledge of, or reason to believe, any of the following, they shall promptly give notice to Terna Energy of:

(i)     any pending or threatened governmental investigation of, or litigation or other legal proceeding pertaining to a Project or a proposed Project site;

(ii)     any litigation, investigation, notice, claim, complaint, proceeding or other written communication by any Entity alleging liability or potential liability arising from or relating to environmental or health or safety matters in relation to Terna Energy or a Project or a proposed Project site;

(iii)     the fact that any Governmental Approval has or may be cancelled, suspended, terminated or impaired; and

(iv)     any other event, act or occurrence which does, or a Service Provider believes, could reasonably be expected to have a material adverse impact on Terna Energy or a Project.

Each notice pursuant to this Section shall be accompanied by a statement of Service Providers setting forth details of the occurrence referred to therein and stating what action Service Providers propose to be taken with respect thereto.

(j)     Miscellaneous.   Service Providers shall provide any other assistance reasonably requested by Terna Energy in connection with the development of a Project, and reasonably within the intended scope of the Project Development Services, including identification and anticipation of problem areas regarding the development of a Project, and taking necessary and commercially reasonable action required to correct any inefficiencies or address any issues that may delay or jeopardize the development of a Project.   As part of the Project Development Services, Service Providers shall provide at no cost to Terna Energy any material available to them requested by Terna Energy and pertinent to the permitting and to the assessment of the potential development of the Phase I Projects, such as, indicatively, energy market studies and reports, transmission reports and/or studies, environmental reports and/or studies whether general or South Dakota or proposed Project area specific. Nothing herein shall obligate or require the Services Providers to incur any costs on behalf of Terna Energy that such Services Providers do not approve in advance or otherwise mutually agree upon a satisfactory payment arrangement with Terna Energy.

The intent is to include in the Project Development Services all supporting work and services necessary for accomplishing at reasonable cost, and in a time-and-resources-efficient manner, the objectives of securing construction and tax equity financing and commencing construction of Phase I Projects as soon as commercially practicable, including, without limitation, all such supporting work and services which are consistent with, contemplated by, or reasonably inferable from the express provisions of this Agreement, whether or not such work or services are specifically mentioned herein, but in each case consistent with the specified terms and conditions of this Agreement and consistent with Prudent Wind Development Practices in accomplishing the above-mentioned objectives.

100491235.4 0078354-00010

27-CV-21-7708

CASE 0:21-cv-01580-WMW-DTS   Doc. 1-1   Filed 07/08/21   Page 26 of 51   Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

Notwithstanding anything herein to the contrary, with respect to all agreements, documents, Governmental Approvals, studies or reports to which Terna Energy and/or the Applicable Project Company will become party or that will otherwise bind Terna Energy and/or the Applicable Project Company, a Project or Project's potential site, and all other material Project Development Services undertakings, Service Providers shall keep Terna Energy reasonably informed as to the status and progress of a Project, indicatively but not exhaustively  such agreements, documents, Governmental Approvals, SDPUC permits, conditional use permits, studies or reports, and other Project Development Services and the Service Providers shall provide to Terna Energy reasonable advanced notice of any negotiation sessions, proceedings or other material events and Terna Energy shall have the right to fully participate in such sessions, proceedings and events, and Terna Energy shall have final approval rights of all agreements, documents and instruments delivered in connection with the Project Development Services.  Service Providers shall comply in all material respects with all permits and all applicable laws.

## ARTICLE 3.

### Remuneration

**3.1    Fixed Fee.**  Commencing on the Effective Date and for the duration of the Initial Term, Terna Energy shall pay to each Service Provider a fixed fee as follows (the "**Fixed Fee**"):

Table 1 - Fixed Fee

|  | Aggregate Phase I Projects' Capacity (APC) | Fixed Fee per annum payable to each Service Provider for the Initial Term USD ($) |
|---|---|---|
| Bracket 1 | ≤ 250MW | 74,750.00$ |
| Bracket 2 | 250<APC≤500MW | 81,250.00$ |
| Bracket 3 | 501<APC≤600MW | 91,000.00$ |
| Bracket 4 | 601<APC≤750MW | 100,750.00$ |
| Bracket 5 | APC > 750MW | 107,250.00$ |

The Fixed Fee shall be payable monthly in advance within  the first five (5) Business Days of each month at the rate of one-twelfth (1/12) of the base annual fee set forth in Bracket 2 of Table 1 above (the "Base Annual Fee").

Upon submission of the first GIA application(s) for a Project or Projects that will occur within the Initial Term, if the aggregate capacity of such Project(s) as stated in the submitted GIA application(s) (the "First GIA Project(s) Capacity") exceeds 500 MW, then the Fixed Fee payable

11

shall be increased retroactively as of the Effective Date from the Base Annual Fee to the fee set forth in the bracket that corresponds to the First GIA Project(s) Capacity as per Table 1. In case that the First GIA Project(s) Capacity is in Bracket 1, no retroactive negative adjustment to the Fixed Fee is due but the Fixed Fee will be adjusted to Bracket 1 from the date of the GIA application onwards.

Apart from the first GIA application(s), the Fixed Fee shall be adjusted (positively or negatively) each time a GIA application for a Project or Projects is submitted within the Initial Term or if amendments are made to existing GIA applications. The adjusted Fixed Fee will be the one in the Bracket corresponding to the aggregate Phase I Projects' Capacity as stated in the submitted GIA application(s) including their amendments if any. There will be no retroactive effect to such adjustments.

For the first Project that achieves Financial Closing during the Term of this Agreement, within five (5) Business Days from such Financial Closing, Terna Energy shall pay to each Service Provider, as a lump sum, an amount equal to fifty four percent (54%) of all the Fixed Fees paid until the said Financial Closing to each Service Provider (the "Lump Sum"). For avoidance of doubt no other Lump Sums will be due in any subsequent Financial Closings.

Except as otherwise agreed in writing or provided in this Agreement, the Fixed Fee and the Lump Sum (if payable) constitute full and sufficient compensation and reimbursement for all the Project Development Services and work performed by the Service Providers hereunder and for any and all of the costs and expenses reasonably incurred by the Service Providers in connection with the performance of the Project Development Services.

### 3.2    Success Fee.

(a)    In the event that Terna Energy decides to proceed with the construction and operation of a Project and actively seeks construction financing for a Project, Terna Energy shall pay to the Service Providers for each Project that achieves Financial Closing during the Term of this Agreement or within eighteen (18) months from its termination (for reasons other than for Service Providers Default under Section 7.2 or for Change of Control under section 7.3) a success fee equal to the product of (a) $20,000 per MW, multiplied by (b) the Project Capacity (the "Success Fee"). The Service Providers shall each be entitled to 50% of the Success Fee.

(b)    The Success Fee shall be payable in installments as follows:

(i)    50% of the Success Fee within five (5) Business Days from Financial Closing of a Project; and

(ii)    50% of the Success Fee within five (5) Business Days from the COD of a Project.

(c)    Prior to a Project's Financial Closing, and at Terna Energy's discretion, Terna Energy shall have the right, in lieu of paying the Success Fee in cash, to offer to the Service Providers the election to receive in exchange for the Success Fee (and without any further consideration from the Service Providers) such number shares in the Applicable Project Company as shall be mutually agreed upon by the Parties at that time. If such offer is made by Terna Energy,

12

each Service Provider may exercise its election to receive shares in the Applicable Project Company in lieu of payment of the Success Fee in cash, independently of the other Service Provider's decision in this respect. If the Parties fail to reach an agreement with respect to the number of shares in the Applicable Project Company to be received by the Service Provider(s) within fifteen (15) Business Days, after receipt of Terna Energy's written offer (or at the end of the mutually agreed upon extension, in case the Parties have agreed to an extension of the 15-day period), such disagreement shall not be subject to the dispute resolution procedure of Article 9, but Terna Energy shall withdraw the offer and pay the Success Fee in cash.

### 3.3   **Project Disposition Fee.**

(a)    In the event that Terna Energy sells a Project, Terna Energy shall pay to the Service Providers for each Project and/or the Applicable Project Company for which a definitive purchase and sale or equivalent agreement (the "PSA") is executed during the Term of this Agreement or within eighteen (18) months from its termination (for reasons other than for Service Providers Default under Section 7.2 or for Change of Control under Section 7.3) a fee equal to one-third (1/3) of the Net Sale Price (the "Project Disposition Fee"). The Service Providers shall each be entitled to 50% of the Project Disposition Fee. Any installments of the Success Fee that may have been paid to the Services Providers pursuant to Section 3.2 shall be deducted from the Project Disposition Fee.

(b)    Payment of the Project Disposition Fee shall be effected in installments in alignment with the payment schedule of the purchase price for the Project and/or the Applicable Project Company (the "Purchase Price") set forth in the PSA. Each installment of the Project Disposition Fee shall be payable within five (5) Business Days from receipt of payment by Terna Energy of a Purchase Price installment under the PSA.

### 3.4   **Land Acquisition Success Fee.**

The estimated and minimum acreage to be secured through Wind Leases within the boundaries of the area of interest for the Phase I Projects is set out in the maps of Exhibit B attached hereto (the "Proposed Phase I Projects' Area")

Terna Energy shall pay to the Service Providers a success fee equal to the product of (a) $3 per acre multiplied by (b) the acreage of the executed Wind Leases within the Proposed Phase I Projects' Area (the "Land Acquisition Success Fee").

The Land Acquisition Success Fee shall be payable as follows:

(a)    Within five (5) Business Days from Service Providers delivering executed Wind Leases for a Project securing the minimum acreage defined in Exhibit B and in line with the provisions of Art 2.1(a);

(b)    Within five (5) Business Days from Service Providers delivering executed Wind Leases for any and all additional land required for a Project as per the provisions of Art 2.1(a).

The Service Providers shall each be entitled to 50% of the Land Acquisition Success Fee.

13

## ARTICLE 4.

### Project Transfer to Service Providers

**4.1** **Service Provider Project Acquisition.** Terna Energy shall at all times during the Term of this Agreement retain the right at its absolute discretion to decide whether or not to proceed with the development of any of the Phase I Projects.  In the event that Terna Energy prior to Financial Closing (a) notifies the Service Providers that it shall not proceed with the development of a Project or (b) terminates the Agreement for any reason other than under the provisions of Sections 7.2 and 7.3, the Service Providers shall have the right to acquire the specific Project.  Upon written notice of the Service Providers that they wish to exercise their right to acquire the Project, Terna Energy shall sell and transfer to the Service Providers or to a designee of the Service Providers, all shares or rights of the Project held by Terna Energy, along with all assets for a price equal to the Project Development Costs.

## ARTICLE 5.

### Term; Performance Standard

**5.1** **Term**.  This Agreement shall be effective and enforceable beginning on the Effective Date and continuing thereafter for a period of three (3) years ("Initial Term") and shall automatically renew for one (1) year periods thereafter (each such period an "Extension Term" and together with the Initial Term, the "Term") unless earlier terminated (i) by either Party for convenience and without any liability to the other Parties, by written notice of termination to the other Parties at least sixty (60) days prior to the end of the then-current term (i.e. whether Initial Term or Extension Term), (ii) in accordance with the provisions of Article 7 hereof, or (iii) upon mutual agreement of the Parties.

**5.2** **Performance Standard**.  Except where otherwise qualified herein, Service Providers shall use commercially reasonable efforts to provide the Project Development Services, and to do so in a manner consistent with the Prudent Wind Development Practices and the terms and conditions of this Agreement.  Service Providers shall, at all times during the term of this Agreement, take commercially reasonable steps to ensure that sufficient personnel are available when required so that the Project Development Services are completed in an efficient, prompt, economical, and professional manner.

## ARTICLE 6.

### Project Management; Representation and Warranties; Covenants

**6.1** **Project Information.**  Service Providers shall jointly prepare and provide to Terna Energy a monthly development progress report in form and substance acceptable to Terna Energy and accompanied by all supporting documentation covering the Project Development Services provided.  Service Providers shall provide such interim reports and status updates as Terna Energy shall reasonably request from time to time.

14

**6.2**     **Project Development Team - Representative Meetings.**

(a)     Service Providers shall jointly propose, subject to Terna Energy's approval, a project development team consisting of such experienced, reputable and qualified professionals, specialists and consultants as may be necessary or desirable to perform the Project Development Services (the "Project Development Team").  Within 10 Business Days after receipt by Terna Energy of sufficient information to enable Terna Energy to make a determination with respect to each team member proposed by Service Providers, Terna Energy shall notify Service Providers of its approval or disapproval of each team member.  If Terna Energy does not approve or disapprove the proposed team members in writing within such 10 Business Day period, all team members and collectively the Project Development Team shall be deemed to be approved.

(b)     Service Providers shall jointly designate one individual to serve as the Service Providers' project manager and Terna Energy shall designate one individual to serve as Terna Energy's representative, who shall serve as the primary contact person for any exchange of information or request for approvals or instructions.  Service Providers shall cause Service Providers' project manager and such other Service Providers' personnel as Terna Energy reasonably requires to attend status and/or information meetings with Terna Energy's representative pertaining to Phase I Projects, as Terna Energy shall reasonably request from time to time.  All such representative meetings shall be held in person at a location agreed by the Parties or by teleconference/videoconference.

**6.3**     **Representations and Warranties.  RW and DPE each represents and warrants, on its own behalf, that:**

(a)     it is a limited liability company or corporation duly formed, validly existing and in good standing under the laws of the State in which it is organized;

(b)     it is not in violation of any applicable laws or regulation, order, writ, injunction or decree of any court which violations, individually or in the aggregate, could reasonably be expected to have a material adverse effect on the ability of RW or DPE, respectively, to perform under this Agreement;

(c)     there are no legal or arbitration proceedings or any proceeding by or before any Governmental Authority now pending or (to the best knowledge of RW or DPE, respectively) threatened against RW or DPE, respectively, which, if adversely determined, could, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of RW or DPE, respectively, to perform under this Agreement;

(d)     none of the execution and delivery of this Agreement, the consummation of the transactions herein contemplated or compliance with the terms and conditions hereof and thereof conflict with or will result in a breach of, or require any consent under, any governance agreement or certificate of formation of RW or DPE, respectively, or any applicable laws or regulation, order, writ, injunction or decree of any court, or any agreement or instrument to which RW or DPE, respectively, is a party or by which it is bound or to which it is subject, or constitute a default under any such agreement or instrument;

15

(e)      it has all necessary power and authority to execute, deliver and perform its obligations under this Agreement; the execution, delivery and performance by RW or DPE, respectively, of this Agreement have been duly authorized by all necessary action on its part and that no other consent, license, permit, approval, authorization, or order of, or filing with, any Governmental Authority is required for the execution, delivery and performance of this Agreement by RW or DPE, respectively, and the consummation of the transactions contemplated hereby, other than those which have been obtained;

(f)      this Agreement has been duly and validly executed and delivered by RW or DPE, respectively, and constitutes the legal, valid and binding obligation of by RW or DPE, respectively, enforceable in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles;

(g)      it is duly qualified or licensed to do business and is in good standing to carry on business in South Dakota; and

(h)      it has all requisite corporate power and authority to enter into and incur the obligations under this Agreement and no other action is necessary for the authorization, execution, delivery and performance by RW or DPE, respectively, of this Agreement.

**6.4      Covenants.  Each of the Service Providers, on its own behalf,** covenants that:

(a)      its employees, contractors and consultants possess the requisite skill, experience and expertise to provide the Project Development Services and perform all other obligations required to be performed by it under this Agreement;

(b)      it shall not take any action which will prevent it from consummating the transactions contemplated in this Agreement and any other related agreements;

(c)      it shall not impose, or suffer to exist a lien imposed by it, on the assets or properties of Terna Energy unless Terna Energy is in default of payment obligation under this Agreement and such default remains uncured;

(d)      it shall not offer, promise, pay or arrange for payment or giving of any benefit or advantage to any Entity or of a public international organization, in exchange for an improper advantage in any form either directly or indirectly, and acknowledges that any violation of this prohibition constitutes a material breach of this Agreement and Terna Energy may terminate this Agreement for cause and with immediate effect, whereas each of the Service Providers shall remain jointly and severally liable for any other sanction provided by law and/or this Agreement;

(e)      until the expiration or earlier termination of this Agreement, Service Providers shall work exclusively with Terna Energy in connection with the Phase I Projects; none of Service Providers or its Affiliates or their respective officers, directors, managers, employees, agents, shall, directly or indirectly, enter into any agreement or engage in, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with any Entity, other than the other Service Provider, Terna Energy or its

16

agents and Affiliates, concerning the Phase I Projects and their potential development, or proceed in any act or omission that might adversely affect or harm Terna Energy's interests in developing the Phase I; and

(f)    none of Service Providers or its Affiliates or their respective officers, directors, managers, employees, agents, shall, directly or indirectly, enter into any agreement or engage in, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with any Entity concerning the potential development of other wind projects within a 100-mile radius from (1) the nearest boundary of a Project, until COD of such Project is completed and (2) the actual location of a wind turbine generator included in a Project, after COD of such Project is completed.

(g)    to the extent that one or both Service Providers intend to pursue the potential development of other wind projects falling outside the 100-mile radius of Section 6.4(f), but within a 500-mile radius from (1) the nearest boundary of a Project, until COD of such Project is completed and (2) the actual location of a wind turbine generator included in a Project, after COD of such Project is completed, such Service Provider(s) shall offer Terna Energy a right of first refusal for the development of such wind project(s) consistent with the terms and conditions of this Agreement. The offer shall be in writing and provide sufficient information to allow Terna Energy to assess the viability and marketability of the potential wind project. If Terna Energy notifies the Service Providers that it does not desire to pursue the development of the offered wind project or if Terna Energy does not respond in writing to Service Providers' notice within thirty (30) days of receipt of Service Providers' offer (or at the end of the mutually agreed upon extension, in case the Parties have agreed to an extension of the thirty (30) day period), then such Service Provider(s) may freely offer such wind project to other Entities without restriction.

### 6.5    Independent Contractor.

(a)    Service Providers and Terna Energy acknowledge the relationship created by this Agreement is between independent contractors. Nothing contained herein shall be construed to create a relationship of employer and employee, principal-agent, joint venture or a partnership or sharing of profits between Service Providers or their Affiliates or their respective officers, directors, managers, agents and Terna Energy or any of Service Providers' and/or Terna Energy's employees. Service Providers shall have no authority to act on behalf of Terna Energy or to make any commitments for Terna Energy or the otherwise bind Terna Energy, an Applicable Project Company, Project or a Project's assets in any manner.

(b)    Service Providers shall have no authority (and shall not hold themselves out as having authority) to bind Terna Energy, and/or its Affiliates (including any Applicable Project Company) or to make any agreement, representation or warranty on behalf of Terna Energy and/or its Affiliates (including any Applicable Project Company), except as specifically authorized by Terna Energy.

(c)    Service Providers shall have the sole discretion to determine the manner and means by which their respective employees shall perform their duties, the hours of work of any of

17

their respective employees and, subject to the nature of the services required, when and where such services are to be performed.

(d)    Service Providers shall be solely liable for their respective personnel towards any Governmental Authority, for all wages, salaries and benefits of their respective employees, for all employment and employment-related taxes and for insurance coverage required for such employees by law (e.g., workers' compensation insurance, unemployment insurance, etc.) and shall be solely responsible for all payments and other obligations to their respective consultants within the scope of the Project Development Services.

(e)    The Parties agree to comply with all applicable federal, state and local laws, ordinances, regulations and codes in the performance of their duties under this Agreement.

### 6.6    Ownership of Documents and Project Assets.

(a)    All information, drawings, specifications, reports, studies, applications, correspondence with Governmental Authorities, agreements, documents and materials and anything of a similar nature, including those in electronic form (collectively, the "Documents") prepared by the Service Providers or any external consultant in connection with the Project Development Services, or which Service Providers obtain in the course of or as result of the Project Development Services shall be the sole and exclusive property of Terna Energy and are not to be used on other projects by the Service Providers.  The Documents shall be surrendered to Terna Energy by the Service Providers upon the earlier of a demand by Terna Energy or promptly after expiration or termination of this Agreement according to its terms; provided, however, that other than to the extent Service Provider Information (as defined below) is  a Document or is contained in or relied upon in a Document nothing herein shall grant Terna Energy any right, license, title, or interest in or to any land lease and option template, power purchase agreement template, development checklist template, development budget template, or any other pre-existing or proprietary information belonging to either of the Service Providers, including, but not limited to, RW's proprietary financial modeling (collectively, "Service Provider Information"), unless Terna Energy agrees to purchase or license such Service Provider Information from the Service Provider-owner through a separate licensing or purchase agreement.

(b)    All Energy Offtake Agreements, GIAs, Wind Leases, Other Real Estate Documents, Governmental Approvals, studies and reports, and any other assets of a Project shall be in name of Terna Energy or the Applicable Project Company and be the sole and exclusive property of Terna Energy or such Applicable Project Company.

### 6.7    Indemnification.

(a)    Indemnification of Terna Energy. Service Providers jointly and severally, shall defend, indemnify and hold harmless each Terna Energy Indemnified Party from and against any and all Claims incurred by or asserted against such Terna Energy Indemnified Party (i) arising as a result of a violation of applicable law to be complied with by Service Providers hereunder, (ii) relating to injury to or death of any person, including employees of Service Providers (iii) resulting from loss of or damage to third party property caused by the Service Providers, or (iv) relating to

18

the failure of Service Providers to comply with the terms of this Agreement; provided, however, in each of cases (ii) and (iii) only to the extent that the Claim results from the negligence or willful misconduct of Service Providers or any Service Providers Indemnified Party; provided, further, however, that Service Providers shall not be required to defend, indemnify or hold harmless any Terna Energy Indemnified Party from and against, and no Terna Energy Indemnified Party shall be exculpated from, any Claims to the extent caused by any Terna Energy Indemnified Party or arising from the breach of this Agreement by Terna Energy or the negligence or willful misconduct of Terna Energy or any Terna Energy Indemnified Party or otherwise not attributable to Service Providers.

(b)     Indemnification of Service Providers. Terna Energy shall defend, indemnify and hold harmless each Service Providers Indemnified Party from and against any and all Claims incurred by or asserted against such Service Providers Indemnified Party (i) arising as a result of a violation of applicable law to be complied with by Terna Energy hereunder, (ii) relating to injury to or death of any person, including employees of Terna Energy, (iii) resulting from loss of or damage to third party property, or (iv) relating to the failure of Terna Energy to comply with the terms of this Agreement; provided, however, in each of cases (ii) and (iii) only to the extent that the Claim results from the negligence or willful misconduct of Terna Energy or any Terna Energy Indemnified Party; provided, further, however, that Terna Energy shall not be required to defend, indemnify or hold harmless any Service Providers Indemnified Party from and against, and no Service Providers Indemnified Party shall be exculpated from, any Claims to the extent caused by any Service Providers Indemnified Party or arising from the breach of this Agreement by Service Providers or the negligence or willful misconduct of Service Providers or any Service Providers Indemnified Party or otherwise not attributable to Terna Energy.

(c)     Indemnification Procedure. When required to indemnify an Indemnified Party in accordance with Section 6.7, Service Providers or Terna Energy, as applicable (in such capacity, the "Indemnifying Party") shall assume on behalf of such Indemnified Party and conduct with due diligence and in good faith the defense of any Claim against such Indemnified Party and shall bear the expense thereof, whether or not the Indemnifying Party shall be joined therein, and the Indemnified Party shall cooperate with the Indemnifying Party in such defense. The Indemnifying Party shall have charge and direction of the defense and settlement of such Claim, provided, however, that without relieving the Indemnifying Party of its obligations hereunder or impairing the Indemnifying Party's right to control the defense or settlement thereof, the Indemnified Party may elect to participate through separate counsel in the defense of any such Claim, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (a) the employment of counsel by such Indemnified Party has been authorized in writing by the Indemnifying Party, (b) the Indemnified Party shall have reasonably concluded that there exists a material conflict of interest between the Indemnifying Party and such Indemnified Party in the conduct of the defense of such Claim (in which case the Indemnifying Party shall not have the right to control the defense or settlement of such Claim on behalf of such Indemnified Party) or (c) the Indemnifying Party shall not have employed counsel reasonably acceptable to the Indemnified Party to assume the defense of such Claim within a reasonable time after notice of the commencement thereof. In each of such cases set forth in the second sentence of this paragraph, the reasonable fees and expenses of counsel shall be at the expense of the Indemnifying Party except where the Indemnifying Party is ultimately deemed not to have been required to provide the indemnity sought by the Indemnified Party.

19

(d)     **Indemnification Among Service Providers.**  Each Service Provider (an "Indemnifying Service Provider") shall at all times indemnify and defend against and save each other Service Provider (each, an "Indemnified Service Provider") harmless from, any and all Claims arising out of or resulting from Indemnifying Service Provider's breach of this Agreement, or any negligent or willful acts or omissions of or on behalf of the Indemnifying Service Provider arising under this Agreement, except to the extent any such Claims result from such Indemnified Service Provider's negligent act or omission, including gross negligence, willful misconduct or breach of its obligations hereunder.

### 6.8     Limitation on Liability; Consequential Damages; Specific Performance.

(a)     NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, EITHER PARTY'S TOTAL LIABILITY TO THE OTHER PARTY(IES) ON ALL CLAIMS OF ANY KIND, WHETHER BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, FOR ALL CLAIMS ARISING OUT OF, OR CONNECTED WITH, OR RESULTING FROM THE PERFORMANCE OR BREACH HEREOF, SHALL BE LIMITED IN THE AGGREGATE TO THE REMUNERATION PAID AND/OR PAYABLE TO SERVICE PROVIDERS UNDER THIS AGREEMENT; PROVIDED, THAT THE FOREGOING LIMITATION OF LIABILITY SHALL NOT APPLY TO (X) CLAIMS RESULTING FROM A PARTY'S FRAUD OR GROSS NEGLIGENCE OR (Y) THIRD PARTY INDEMNITY CLAIMS OWING TO AN INDEMNIFIED PARTY PURSUANT TO SECTIONS 6.7(a) AND 6.7(b).

(b)     NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, IN NO EVENT, WHETHER AS A RESULT OF BREACH OF CONTRACT, TORT LIABILITY (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY(IES) FOR SPECIAL, PUNITIVE, INCIDENTAL, INDIRECT, EXEMPLARY, OR CONSEQUENTIAL DAMAGES OF ANY NATURE WHATSOEVER, INCLUDING LOSS OF PROFITS OR REVENUES.

## ARTICLE 7.

### Termination

**7.1     Termination by Service Providers for Cause.**  Any Service Provider shall be entitled to terminate this Agreement by delivery of a written notice of termination to Terna Energy and the other Service Provider for any of the following events, each constituting an event of default by Terna Energy ("Terna Energy Default"):

(a)     Payment Default.  If Terna Energy fails to make when due any undisputed payment owed to a Service Provider under this Agreement and such failure is not cured by Terna Energy within thirty (30) days of notice of such failure;

20

(b)     Performance Default.  If Terna Energy is in default of any duty or obligation hereunder, and such default is not cured by Terna Energy thirty (30) days after it shall have received written notice of such failure by either Service Provider.

(c)     Assignment. If Terna Energy assigns this Agreement not in conformity with the provisions of Section 11.6.

(d)     Dissolution, Bankruptcy or Insolvency.  Any of the following events shall have occurred with respect to Terna Energy (i) dissolution or liquidation, (ii) filing of any petition or action under any bankruptcy, reorganization, insolvency or similar Law ("Bankruptcy Law"); (ii) any affirmative act of insolvency (including the consent to the entry of an order for relief in an involuntary case, consent to the appointment of a receiver, any assignment for the benefit of creditors or the admission of its inability to pay its debts as they become due); (iii) the filing of an involuntary petition under any Bankruptcy Law which is not dismissed or stayed within sixty (60) days thereafter; or (iv) the appointment of a receiver or trustee, which appointment is not dismissed or stayed within (60) days thereafter.

In the case of termination of this Agreement by Service Providers under this Section 7.1, Service Providers shall be entitled to payment of all accrued and unpaid Fixed Fee and Land Acquisition Success Fee (if any) as of the date of such termination.

**7.2     Termination by Terna Energy for Cause.**  Terna Energy shall be entitled to terminate this Agreement by delivery of written notice of termination to each Service Provider for any of the following events, each constituting an event of default by the applicable Service Provider ("Service Providers Default"):

(a)     Performance Default.  A Service Provider is in default of its duties and obligations hereunder, and such default is not cured by Service Provider or the other Service Provider (30) days after each Service Provider shall have received written notice of such failure from Terna Energy.  It is understood that any Service Provider shall have the obligation, upon the occurrence of a performance default of a Service Provide to take any remedial actions it deems necessary to cure such default.

(b)     Breach of Representations and Warranties.  Any representation or warranty or covenant made by a Service Provider in this Agreement contains an untrue or misleading statement of material fact as of the date made and such untrue or misleading statement has, or could have, a material adverse effect on Terna Energy or on the ability of a Service Provider to perform its obligations hereunder, which remains uncured thirty (30) days after Service Providers shall have received written notice of such breach from Terna Energy.

(c)     Assignment. If a Service Provider assigns this Agreement not in conformity with the provisions of Section 11.6.

(d)     Dissolution, Bankruptcy or Insolvency.  Any of the following events shall have occurred with respect to either Service Provider: (i) dissolution or liquidation, (ii) filing of any petition or action under any bankruptcy, reorganization, insolvency or similar Law ("Bankruptcy Law"); (ii) any affirmative act of insolvency (including the consent to the entry of an order for relief in an involuntary case, consent to the appointment of a receiver, any assignment

21

for the benefit of creditors or the admission of its inability to pay its debts as they become due); (iii) the filing of an involuntary petition under any Bankruptcy Law which is not dismissed or stayed within sixty (60) days thereafter; or (iv) the appointment of a receiver or trustee, which appointment is not dismissed or stayed within (60) days thereafter.

In the case of termination of this Agreement by Terna Energy under this Section 7.2, the exclusivity obligation of Service Providers set forth in Section 6.4(e) shall survive termination of this Agreement and continue in full force and effect for a period of two (2) years from termination of this Agreement. The termination of this Agreement by Terna Energy under this Section 7.2 shall be without prejudice to and Terna Energy may exercise any and all other rights, claims, causes of action or remedies which Terna Energy may otherwise have against Service Providers under this Agreement, at law or in equity.

     **7.3**    **Termination for Change of Control.**  Terna Energy shall have the right to terminate this Agreement, without any liability to Service Providers by giving sixty (60) days prior written notice to Service Providers if a Change of Control occurs to either Service Provider.

     **7.4**    **Survival.**  The obligations and conditions set forth in Sections 6.4(f), 6.5, 6.6, 6.7, 6.8, Article 8, Article 9, and Article 11 and such other provisions of this Agreement that expressly impose obligations on the Parties following termination, shall survive in full force the expiration or termination of this Agreement, including, but not limited to, any obligations of Terna Energy to pay the Service Providers any amount owed hereunder.

## ARTICLE 8.

### Confidentiality

**8.1**    **Obligation of Confidentiality.**

     (a)    Except as required by applicable law, unless otherwise agreed to in writing by the Parties, the Parties shall (i) keep all Confidential Information confidential, (i) not disclose or reveal any Confidential Information to any Entity other than the representatives of the Parties who are actively and directly participating in the transactions contemplated hereby or who otherwise need to know the Confidential Information for such purpose and shall cause those Entities to observe the terms of this Section 8.1 and (ii) not use Confidential Information for any purpose other than in the performance of its obligations under this Agreement. Each Party shall continue to hold all Confidential Information according to the same internal procedures and with the same degree of care regarding its secrecy and confidentiality as currently applicable thereto. A Party shall notify the other Parties of any unauthorized disclosure to third parties that they discover, and shall endeavor to prevent any further such disclosures. Each Party shall be liable for any breach of the terms of this Section 8.1 by such Party or their respective Affiliates or representatives.

     (b)    From and after the date hereof, in the event that a Party is requested pursuant to, or required by, Applicable Law or by legal process to disclose any Confidential Information ("Disclosing Party"), such Disclosing Party shall provide the other Parties ("Non-Disclosing Parties") with prompt notice of such request or requirement in order to enable any Non-Disclosing

22

Party to seek an appropriate protective order or other remedy, to consult with the Disclosing Party with respect to taking steps to resist or narrow the scope of such request or legal process, or to waive compliance, in whole or in part, with the terms of this Section 8.1(b). Each Disclosing Party agrees not to oppose any action by a Non-Disclosing Party to obtain a protective order or other appropriate remedy after the date hereof. In the event that no such protective order or other remedy is obtained, or that the Non-Disclosing Party waives compliance with the terms of this Section 8.1(b), the Disclosing Party shall furnish only that portion of the Confidential Information which the Disclosing Party is advised by counsel is legally required. In any such event, the Disclosing Party shall use their commercially reasonable efforts to ensure that all Confidential Information and other information that is so disclosed will be accorded confidential treatment.

## ARTICLE 9.

### Dispute Resolution

**9.1    Dispute Resolution.**

(a)    (i) Any Dispute that cannot be resolved by the Parties within ten days after receipt by a Party of written notice of such Dispute from the other Party shall be referred to a panel consisting of a senior executive of each Party or any of its Affiliates, if applicable, with authority to decide or resolve such Dispute, for review and resolution, (ii) such senior executives shall meet either in person or by teleconference or videoconference and attempt to resolve such Dispute within 15 days after receipt of such written notice and (iii) if, for any reason, such Dispute has not been resolved within 30 days after receipt of such written notice (or at the end of the mutually agreed upon extension, in case the Parties have agreed to an extension of the 30 day period) and, subject to Section 9.1(b), either Party shall be entitled to all of its rights and remedies available to it at Law and in equity.

(b)    With respect to any Dispute, the Parties hereby agree to submit to the exclusive jurisdiction of the courts of the State of Minnesota, and United States District Courts, located in Hennepin County, Minnesota (and any appellate court thereof) (collectively, the "Minnesota Courts"); provided, however, that solely for the purposes of enforcing any final judgment, the Parties hereby agree that the jurisdiction of the Minnesota Courts shall be non-exclusive. Each Party irrevocably waives, to the fullest extent permitted by Law, any objection it may now or hereafter have to the jurisdiction of the Minnesota Courts with respect to any Dispute or the laying of the venue of any Dispute brought in such a court and any claim that any Dispute brought in such a court has been brought in an inconvenient forum. Each Party hereby consents to service of process at its address set forth in Section 11.2 as permitted by applicable law, and agrees that its submission to such jurisdiction and its consent to such service of process are made for the express benefit of the other Party. **EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY DISPUTE.**



100491235.4 0078354-00010

## ARTICLE 10.

### Force Majeure

**10.1    Definition of Force Majeure.**

The term "Force Majeure", as used in this Agreement, means an event or circumstance beyond the reasonable control of, and without the fault or negligence of, the Party claiming Force Majeure (the "Claiming Party") and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid, including, without limitation, acts of God,  sudden actions of the elements such as floods, earthquakes, hurricanes, or tornadoes; lightning; fire; ice storms; sabotage; terrorism; war; riots; fire; explosion; blockades; insurrection; strike; slow down or labor disruptions (even if such difficulties could be resolved by conceding to the demands of a labor group); actions or inactions by any Governmental Authority taken after the date hereof (including the adoption or change in any rule or regulation or environmental constraints lawfully imposed by such Governmental Authority) but only if such requirements, actions, or failures to act prevent or delay performance hereunder.

**10.2    Applicability of Force Majeure.**

Neither Party shall be responsible or liable for any delay or failure in its performance under this Agreement, nor shall any delay, failure, or other occurrence or event become an event of default, to the extent such delay, failure, occurrence or event is substantially caused by conditions or events of Force Majeure, provided that:

(a)    the Claiming Party gives the other Party prompt written notice describing the particulars and offering reasonable support of the occurrence of the Force Majeure;

(b)    the suspension of performance is of no greater scope and of no longer duration than is required by the Force Majeure;

(c)    the Claiming Party proceeds with reasonable diligence to remedy its inability to perform and provides weekly progress reports to the other Party describing actions taken to end the Force Majeure; and

(d)    when the Claiming Party is able to resume performance of its obligations under this Agreement, the Claiming Party shall give the other Party written notice to that effect.

The existence of a condition or event of Force Majeure shall not relieve the Parties of their obligations under this Agreement (including, but not limited to, payment obligations) to the extent that performance of such obligations is not precluded by the condition or event of Force Majeure.

## ARTICLE 11.

### Miscellaneous

**11.1    Notices.**

100491235.4 0078354-00010

Except as otherwise expressly provided herein, all notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given when delivered personally or by overnight courier service or when mailed by certified or registered mail, return receipt requested, with postage prepaid to the Parties or facsimile or other electronic transmission (including electronic mail) to the following addresses (or at such other address for a Party as shall be specified by like notice):

**11.2    Addresses.**

For the purposes hereof, the addresses of the Parties are:

In the case of Terna Energy:

> Terna Energy USA Holding Corporation
> 180 Montgomery Street, Suite 2190
> San Francisco, CA 90104
> Attention:  the Development Director
> Facsimile:  +415 398 3917
> E-mail: ternaenergy@terna-energy.com

In the case of the Service Providers:

> RedWind Renewables, LLC
> 9853 Frederick Place
> Eden Prairie, MN 55347
> Attention: Daniel Rustowicz
> E-mail: drusty@redwindrenew.com
>
> Dakota Plains Energy, Inc.
> 1311 North 4th Street
> Aberdeen, SD 57401
> Attention: Heath Johnson
> E-mail: heathj@dakota-plains.com

Upon written notice, any Party may change the address to which notices, requests, demands or other communications are to be sent or add such additional addresses as it may reasonably request.

**11.3    Waiver of Breach.**

No failure to exercise and no delay in exercising, on the part of either Party, any right, remedy, power or privilege provided herein or by statute or at law or in equity shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**11.4    Amendments and Waivers.**

100491235.4 0078354-00010

Any term of this Agreement may be modified, waived or amended only with the written consent of the Parties.

**11.5    Obligation to Act in Good Faith**.

Each Party agrees that it will conduct itself and perform its obligations under this Agreement in good faith. Each Party shall keep the other Party fully and fairly informed of all material matters related to the rights and obligations of the Parties under this Agreement and in respect of the Project.

**11.6    Assignability**.

Neither Party may assign in whole or in part this Agreement or any right or obligation under this Agreement without the prior written consent of the other Parties, which consent will not be unreasonably conditioned, delayed or withheld; provided, however, that Terna Energy may assign in whole or in part this Agreement or any of its rights or obligations under this Agreement to any Entity that is an Affiliate of Terna Energy without the consent of the Service Providers; provided, however, in any such assignment to an Affiliate, Terna Energy shall remain jointly and severally liable for any payment obligations of Terna Energy due or incurred prior to such assignment. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and permitted assigns.

**11.7    Other Business Activities**.

Subject to the provisions of Section 3.2 (c), Service Providers shall not have any right by virtue of this Agreement in or to any other venture of Terna Energy, nor shall Service Providers have any right to participate in the income or profits derived therefrom.

**11.8    Severability**.

If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

**11.9    Headings and Table of Contents**.

The headings in and the table of contents of this Agreement are for reference purposes only and shall not limit or otherwise affect the meaning hereof.

**11.10    Governing Law and Language.**

This Agreement shall be governed by, and construed in accordance with, and any claims brought in connection herewith shall be adjudicated under, the laws of the State of Minnesota, without giving effect to conflicts of law provisions thereof. This Agreement has been negotiated and executed by the Parties in English. In the event any translation of this Agreement is prepared for convenience or any other purpose, the provisions of the English version shall prevail.

**11.11    Counterparts**.

100491235.4 0078354-00010

Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

**11.12   Entire Agreement.**  This Agreement sets forth the entire agreement of the parties hereto with respect to its subject matter, and supersedes all previous understandings, written or oral, with respect thereto.

**11.13   Joint Negotiation.**

This Agreement shall be considered for all purposes as prepared through the joint efforts of the Parties and shall not be construed against one Party as a result of the preparation, submission or other event of negotiation, drafting or execution hereof.

[ The signature page to this Agreement appears on the next page ]
[ The remainder of this page is intentionally left blank ]



27

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

**Terna Energy USA Holding Corporation**
a Delaware corporation

By: _____

Name: Emmanouil Moustakas
Its: Chief Executive Officer

**RedWind Renewables, LLC**
a Minnesota limited liability company

By: *Daniel Rustowicz*
Name: Daniel E. Rustowicz
Its: Chief Executive Officer

**Dakota Plains Energy, Inc.**
a South Dakota corporation
[NOTE: Correct entity to be confirmed by Service Providers]

By: _____
Name: _____
Its: _____

[Signature Page to Wind Farm Project Development Agreement]

100491235.4 0078354-00010

IN WITNESS WHEREOF, this Agreement has been executed as of the date first above written.

**Terna Energy USA Holding Corporation**
a Delaware corporation


By: _____

Name: Emmanouil Moustakas
Its: Chief Executive Officer



**RedWind Renewables, LLC**
a Minnesota limited liability company


By: _____
Name: Daniel E. Rustowicz
Its: Chief Executive Officer



**Dakota Plains Energy, Inc.**
a South Dakota corporation
[NOTE: Correct entity to be confirmed by Service Providers]

By: _____
Name: Robin K. Johnson
Its: Principal



[Signature Page to Wind Farm Project Development Agreement]

100491235.4 0078354-00010

Exhibit A

Project Development Targeted Time Schedule and Milestones (*) for the Phase I Projects

| TASK | START/END & Milestones* | Duration & Milestones | 1. Responsibility / 2. Coordination |
|---|---|---|---|
| Landowner enrollment and holding meetings | 9/1/2019-4/30/2019 | 8 MONTHS | 1.Service Providers, 2.Te |
| Secure met mast locations | 9/1/2019-9/30/2019 | 1 MONTH | 1.Service Providers, 2.Te |
| **Minimum of project area secured *** | **1/31/2020*** | | 1.Service Providers, 2.Te |
| Procure met mast installation crew | 9/1/2019-9/30/2019 | 1 MONTH | 1.Te, 2.Service Providers |
| Met Masts installation complete | 10/01/2019-10/20/2019 | 20 DAYS | 1.Te, 2.Service Providers |
| **Targeted project area 100% secured*** | **04/30/2020*** | | 1.Service Providers, 2.Te |
| Desktop Environmental Review and associated desktop studies | 10/1/2019-11/30/2019 | 2 MONTHS | 1.Te, 2.Service Providers |
| **Conditional Use Permits (County zoning authorization)*** | **June   2020*** | | 1.Service Providers, 2.Te |
| Four Seasons avian/bat/environmental studies | 11/1/2019 – 10/30/2020 (or 2021) | 12 MONTHS (may be extended to 24 months) | 1.Te, 2.Service Providers |
| Wetlands & Watercourses in-situ Studies and authorization | 5/1/2020-10/30/2020 | 6 MONTHS | 1.Te, 2.Service Providers |
| **SD PUC Facility Permit Application *** | **April 2021*** | Comment : required draft GIA plus the | 1.Te, 2.Service Providers |

| | | completion of most environmental studies | |
|---|---|---|---|
| Project applies for MISO Interconnection | April 2020 – Oct 2021 | 17 MONTHS | 1.Te, 2.Service Providers |
| **Review and execute Generator Interconnection Agreement** * | **Sept 2021*** | | 1.Te, 2.Service Providers |
| **SD PUC Facility Permit Issued** * | **Jan 2022*** | | 1.Te, 2.Service Providers |
| **Permitting & Interconnection process completed (Federal, State, County)*** | **Jan 2022*** | | 1.Te, 2.Service Providers |
| Commence Reverse RFP/PPA procurement process | Jun 2021 | 8 MONTHS | 1.Te, 2.Service Providers |
| **PPA executed with off-taker and Project NTP*** | **Feb 2022*** | | 1.Te, 2.Service Providers |
| Financial Closing and beginning of Construction of project | Q2-Q3 2022 (start dates) | | Te |
| **Commercial Operation Date*** | **Q4 2023*** | | Te |

Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

## Exhibit B

## Proposed Phase I Projects' Area

The boundaries of the area of interest for the Phase I Projects are depicted via red lines in the following maps:

- **Sully County Project, SD** (the outline of the area of interest is located at a 5.5 miles distance to the NE of Onida & 9.5 miles to the E of Agar)





Approximate acreage : 37.000 acres

Minimum acreage for Jan 2020 : 20.000 acres

- **Faulk County Project, SD** (the outline of the area of interest is located at a 5.5 miles distance to the SW of Faulkton and 4 miles to the WNW of Orient)



Approximate acreage : 18.000 acres

Minimum acreage for Jan 2020 : 10.000 acres

- **Groton area of interest consisting of the Day Wind and Dakota Zephyr Wind sites as below:**

    a) **Day Wind site, Day County, SD** (the outline of the area of interest is located at a 2.8 miles distance to the WNW of Bristol and 0.8 miles to the E of Andover)



Acreage : 22.000 acres

Minimum acreage for Jan 2020: 12.000 acres

100491235.4 0078354-00010

Filed in District Court
State of Minnesota
6/17/2021 9:57 AM

b) **Dakota Zephyr Wind , Day and Brown Counties, SD** (the outline of the area of interest is located at a 6.6 miles distance to the SE of Groton and 0.8 miles to the S of Andover)



Acreage:  20.000 acres

Minimum acreage for Jan 2020: 10.000 acre

STATE OF MINNESOTA )                                    Court File #
                   ) ss.
COUNTY OF HENNEPIN )

RedWind Renewables, LLC and

Dakota Plains Energy, Inc.,

           Plaintiff(s),

vs.

                                          **AFFIDAVIT OF SERVICE**

Terna Energy USA Holding Corporation,

           Defendant(s).

---

**PRO LEGAL SUPPORT SERVICES, INC.**

I, Shelly Miles, state that on May 5, 2021, at 2:10 pm, I served a copy of the Summons and Complaint with Exhibits in the above entitled action upon Terna Energy USA Holding Corporation, c/o Registered Agent: Cogency Global, Inc. therein named, at 850 New Burton Rd, Dover, DE 19904, in the County of Kent, by handing to and leaving with Naketa Latimore (Authorized Agent) true and correct copies thereof.

I declare under penalty of perjury that everything I have stated in this document is true and correct. Minn. Stat. § 358.116.

Signed in the state of: Delaware
In the county of: Kent

Dated: May 10, 2021

                                      Shelly Miles
                                      7800 Metro Parkway #300
                                      Bloomington, MN 55425
                                      (612) 860-5844
                                      service@prolegalmn.com